1

2

3

4

Gloria Grening Wolk, MSW
Pro Se
4558-B Capital Blvd. #168
Raleigh, N.C. 27604
Ph 919.875.8627  Fax 815.572.9707
E-mail ggwolk@Viatical-Expert.net

5

6

7

8

U.S. DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

11

12

13  GLORIA GRENING WOLK, MSW

14     Plaintiff,

15     vs.

16  PHILIP R. GREEN; GREEN AND GREEN

17  LAW FIRM,

18     Defendants

Case No.: C0605025 BZ

**SECOND AMENDED COMPLAINT FOR
LEGAL MALPRACTICE, EXTORTION,
MISREPRESENTATION, WILLFUL
MISCONDUCT, ELDER FRAUD,
BREACH OF FIDUCIARY DUTY,
INFLICTION OF EMOTIONAL DISTRESS,
UNJUST ENRICHMENT**

**DEMAND FOR JURY TRIAL**

Honorable Benjamin Zimmerman

19

20

21

22

23

24

25

26

The Parties

1.      Plaintiff Gloria Grening Wolk, formerly, a resident of Orange County, California, now resides in Raleigh, North Carolina.

2.      Defendant Philip R. Green, an attorney, Officer of the Court, and principal of the Green & Green law firm has offices in San Raphael and San Francisco. On information and belief Defendant Philip is a resident of Marin County, California.

Jurisdiction

3.      Jurisdiction is proper under 28 U.S.C. 1332 because of diversity of the parties and the sum of direct and proximate damages exceed $75,000.

Statute of Limitations and Service of Complaint

4.      Dismissal of the underlying lawsuit was filed on August 19, 2005 but Defendant continued to represent the Plaintiff in regard to significant settlement terms through September 15, 2005. Thus, the complaint was timely filed, on August 21, 2006 and was served within the requisite 120 days.

## FACTS OF THE CASE

### A.   SUMMARY

1.      The underlying lawsuit, *Wilbanks v. Wolk*, began in 2001. It was a typical SLAPP suit—a meritless suit filed to silence a critic who speaks out on an issue of public concern.[1] If the initial attorneys handled it properly, the case would have been

---

[1] SLAPP is an anacronym for Strategic Lawsuit Against Public Participation. The essence of the anti-SLAPP statute is codified as C.C.P. §425.16:
 (a) The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and

1  dismissed within a few months and the SLAPP filer would have paid Wolk's legal fees.

2  Because it wasn't handled properly, it dragged out until 2005 and was scheduled for trial

3  on August 8th. Wolk was in pro pro and desperate to find an attorney to take the case to

4

5  petition for the redress of grievances. The Legislature finds and declares that it is in the public
   interest to encourage continued participation in matters of public significance, and that this
6  participation should not be chilled through abuse of the judicial process. To this end, this section
   shall be construed broadly.
7   (b) (1) A cause of action against a person arising from any act of that person in furtherance of
   the person's right of petition or free speech under the United States or California Constitution in
8  connection with a public issue shall be subject to a special motion to strike, unless the court
   determines that the plaintiff has established that there is a probability that the plaintiff will
9  prevail on the claim.
        (2) In making its determination, the court shall consider the pleadings, and supporting
10  and opposing affidavits stating the facts upon which the liability or defense is based.
        (3) If the court determines that the plaintiff has established a probability that he or she
11  will prevail on the claim, neither that determination nor the fact of that determination shall be
   admissible in evidence at any later stage of the case, and no burden of proof or degree of proof
12  otherwise applicable shall be affected by that determination.
    (c) In any action subject to subdivision (b), a prevailing defendant on a special motion to strike
13  shall be entitled to recover his or her attorney's fees and costs.  If the court finds that a special
   motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall
14  award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to
   Section 128.5.
15   (d) This section shall not apply to any enforcement action brought in the name of the people of
   the State of California by the Attorney General, district attorney, or city attorney, acting as a
16  public prosecutor.
    (e) As used in this section, "act in furtherance of a person's right of petition or free speech
17  under the United States or California Constitution in connection with a public issue" includes:
        (1) any written or oral statement or writing made before a legislative, executive, or
18  judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral
   statement or writing made in connection with an issue under consideration or review by a
19  legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any
   written or oral statement or writing made in a place open to the public or a public forum in
20  connection with an issue of public interest; (4) or any other conduct in furtherance of the
   exercise of the constitutional right of petition or the constitutional right of free speech in
21  connection with a public issue or an issue of public interest.
    (f) The special motion may be filed within 60 days of the service of the complaint or, in the
22  court's discretion, at any later time upon terms it deems proper.  The motion shall be noticed for
   hearing not more than 30 days after service unless the docket conditions of the court require a
23  later hearing.
    (g) All discovery proceedings in the action shall be stayed upon the filing of a notice of motion
24  made pursuant to this section.  The stay of discovery shall remain in effect until notice of entry
   of the order ruling on the motion.  The court, on noticed motion and for good cause shown, may
25  order that specified discovery be conducted notwithstanding this subdivision.

26

trial. The previous year she rejected a "walk away" settlement because she was adamant about going to trial in order to get the facts on record and clear her reputation.

2.  The facts that Wolk wanted on record were:

a.  The SLAPP filer had no proof that Wolk published the allegedly defamatory statements, "Wilbanks is incompetent" and "Wilbanks is unethical." He had no proof because Wolk did not publish those sentences.

b.  There was evidence, never introduced into the court record, which would have established exactly what was published. That evidence was stored by the Internet Way-Back Machine (www.archive.org), which frequently is used in litigation by copyright and trademark attorneys.

3.  On May 2, 2005, attorney Philip R. Green agreed by phone to prepare and take the case to trial. Since it was near to trial date, he required a retainer of $10 thousand sent by overnight mail. Wolk sent the check. Two days later Defendant sent, as email attachments, his agreement and the substitute attorney form.

4.  On August 19 Wolk agreed to settle the case because she had no choice: Defendant had not prepared for trial. When the terms of the settlement were finalized in September, Wolk succumbed to Defendant's coercion, agreeing to require archive.org to withhold from the public the stored pages of her Web site—the exact pages that proved she did not defame Wilbanks. The effect was the opposite of the reason that Defendant was hired.

**B.   BACKGROUND**

5.   Plaintiff Gloria Wolk is a consumer advocate and author who provides

information to protect the public from fraud by the viatical and life settlement industry. This unique industry began in 1989 with an altruistic purpose: Newly established companies provided cash to people who were near death. The cash payment ("viatical settlements") was a percentage of the death benefit of the life insurance policies of the insureds. Viatical companies bought the policies as investments and collected their profits—full death benefits—upon the demise of the insureds.

6.      Not all companies were altruistic. Some victimized the "viators" (terminally ill people who sold their policies). For that reason in 1992 California became the first state to enact a statute to protect viators.

7.      Four years later, in 1996, Congress acknowledged the value of these settlements by including a provision in HIPAA to make viatical settlements tax free, when paid by a licensed viatical company to an insured whose life expectancy was less than twenty-four months.

8.      That year Wolk published a book ("Ca$h for the Final Days: A Financial Guide for the Terminally Ill & their Advisors") to help viators avoid being victimized by viatical companies. In order to get the book in print as quickly as possible, she set up her own publishing company, Bialkin Books.

9.      Within a year of publication Wolk began to receive phone calls from people seeking information about investing in viaticated policies. Since there were no other books on this industry, some bookstores gave these people the phone number for Bialkin Books, on the chance that the publisher had a book in the pipeline about viatical investments.

10.     The increasing volume of inquiries made it apparent that the public had

great need for information about the risks and the misrepresentations used to induce investors to buy the viaticated policies. Wolk researched the issues, enlisted co-contributors who specialized in specific aspects (i.e., life expectancy predictions, state guarantee funds, etc.) and, in August 1998 published "Viatical Settlements: An Investor's Guide."

11.    Months prior to publication the Internet bookstore, amazon.com, began to advertise the book and accepted pre-publication orders. This caused prospective investors, who wanted immediate information, to contact the Plaintiff. In order to quickly provide the information, in February 1998 her Web site went online: www.Viatical-Expert.net.

12.    The Web site soon consisted of more than 300 pages. Wolk warned about a Ponzi scam that purported to sell viaticated policies but actually sold empty promises, and she warned about misrepresentations (i.e., "IRS approved for IRAs"). Within two years (and every year since) viatical investments were among the top ten frauds listed by the North American Securities Administrators Association.

13.    Much of the information collected by Wolk became the basis for government fraud investigations which, in turn, resulted in numerous civil and criminal lawsuits. Many perpetrators were jailed, a few sentenced to 30 years or more. At least six companies were placed under the control of receivers, conservators, or bankruptcy trustees. Tens of thousands of investors worldwide lost billions of dollars.

14.    Some fraud perpetrators viewed Wolk as the cause of their problems. They used threats, harassment, and frivolous lawsuits to try to silence the flow of

1   information from her Web site and books. Two of the companies who filed meritless

2   lawsuits asked their respective state courts to ban the sale of the Plaintiff's books.

3   15.     Wolk's activities on behalf of victims included efforts to recover funds for

4   defrauded viators as well as investors. She always requested that victims file complaints

5   with their respective state regulatory agency. Although some states demanded

6   restitution for investors, not until 2006 did any state take action on behalf of a viator.

7   16.     In 1998 a viator from San Francisco contacted Wolk. The viator hoped

8   Wolk would warn other AIDS patients about dealing with the viatical broker who he felt

9   had betrayed his trust. He sent documents, including the complaint he filed with the

10  California insurance department. Wolk posted a warning on her Web site—that viators

11  should be careful when dealing with this broker—and summarized the events behind

12  the warning.

13  17.     In August 1998, shortly after the warning was published, the viatical broker

14  sent a letter of protest to Wolk, purporting to quote the statement on her Web site. She

15  refused to remove the warning because there was nothing untrue about it, she had

16  documents to support what she published, and the broker refused to take responsibility

17  for his actions.

18  18.     Three years later, the broker filed a defamation suit against Wolk. She

19  enlisted the services of a law firm, and gave them copies of the correspondence.

20  Although this should have established that the case was time-barred by the statute of

21  limitations, the law firm neglected to raise this issue. The agreement with the law firm

22  was specific—that they would file the special motion to strike under the anti-SLAPP

statute. Had they done so immediately after accepting representation, the case would have ended quickly.

19.     As Defendant knows—because he discussed the case with attorney David Greene, president of First Amendment Project (who advised and supported Wolk's efforts)—the first law firm botched the case at every turn. Most important was that the initial lawyers did not provide the Court with copies of the actual Web pages at the center of the controversy, nor demand proof of the allegations. For that reason, the Plaintiff was determined to go to trial: to get the truth out.

20.     Four years later, with the trial date only months away, Wolk was in pro per, struggling to learn on the run and simultaneously trying to find an attorney who was competent and willing to take the case to trial.  Advice from The Reporters' Committee for Freedom of the Press led Wolk to a lawyer who specialized in media law and who had an outstanding reputation. He was interested; he even had a friend who was helped by Wolk. Unfortunately, there was a conflict: another attorney at his office had represented the SLAPP filer in an earlier lawsuit. The attorney suggested Philip R. Green who, he believed, not only would have the time but be less expensive.

21.     On May 2, 2005 when defendant Philip R. Green agreed to take the case to trial, because trial date was August 8th he instructed Wolk to overnight a retainer larger than usual: ten thousand dollars. He warned that the total may come to $40 thousand. Wolk told him that if she no longer had to spend time and energy defending herself, she would be able to do income-producing work.

22     On May 4, 2006 Defendant sent, via email, an employment contract

and substitute attorney form. These were signed and returned, per instructions, by overnight Federal Express.

23.    On or about May 8, 2005, Defendant notified Wolk that he would be on vacation in England at the time of trial. He said he would request the Court for a continuance of the trial date, which should not be a problem since she had not previously requested a continuance.

24.    Defendant neglected to inform Wolk that he would not file the substitute attorney form unless the trial date was continued, nor that he would not file his motion to continue trial date for another month, and that the motion would not be heard until June 28, 2005—nearly three months after he agreed to represent her and one month before trial date.

25.    During those months and after the continuance hearing Defendant

       a.  did not file the form to substitute as attorney;

       b.   continued to demand more and more money from the Plaintiff;

       c.  continued to threaten to quit if additional money was not forthcoming;

       d.   refused to refund any monies so that Plaintiff could hire another attorney;

       e.  failed to prepare for trial and, in particular, failed to schedule the deposition of the SLAPP plaintiff in a timely fashion;

       f.   threatened to cancel the deposition of the SLAPP plaintiff unless Wolk gave him an additional $10 thousand;

26.    Defendant misrepresented himself to the trial court as well as the Plaintiff.

He told the judge that his first contact with the Plaintiff was May 10, not May 2; that he filed the motion for continuance within 15 days of that contact; that he had the signed substitution in hand and would file it if the motion was granted.

27.     Defendant also told the Court that if the trial date was not continued, he would not file the substitute attorney form, and that would leave the Plaintiff in the lurch on the eve of trial.

28.     The Court granted another two weeks. Despite his promise to the Court, Defendant did not file the substitute form that day, nor the next day, nor the next week, nor the week after. Although defendant Philip later admitted that he could be held liable for perjury, he used his failure to substitute as attorney of record to extort more money from Wolk—repeatedly threatening to "QUIT" unless she paid additional sums.

29.     Defendant performed no useful services for the Plaintiff. The final betrayal was in September 2005, when Defendant insisted that Wolk agree to withhold from public view the pages that proved she had not defamed the SLAPP filer. This was the exact opposite of the purpose for which he was hired.

## FIRST CAUSE OF ACTION

<u>Legal Malpractice</u>

30.     Plaintiff incorporates by reference as if fully set forth below each and every allegation in the foregoing paragraphs.

31.     The elements of a cause of action for professional negligence are (1) the duty of the professional to use such skill, prudence and diligence as other members of the profession commonly possess and exercise; (2) breach of that duty; (3) a causal connection between the negligent conduct and the resulting injury; and (4) actual loss or

damage resulting from the professional negligence. *Nichols v. Keller* (1993) 15 Cal.App. 4th 1672, 1682; 19 Cal Rptr.2d 601; *Schultz v. Harney* (1994) 27 Cal.App.4th 1611, 1621, 33 Cal.Rptr.2d 276; *Younan v. Caruso* (1996) 51 Cal.App.4th 401, 408; 59 Cal. Rptr.2d 103; *Budd* v. *Nixen* (1971) 6 Cal.3d 195, 200, 98 Cal.Rptr. 849, 491 P.2d 433; *Thompson* v. *Halvonik* (1995) 36 Cal.App.4th 657, 661.

32.     Defendant breached the duty of care in numerous instances including failure to schedule any depositions other that than of the SLAPP filer, and scheduling that deposition on the last day before discovery cutoff.

33.     When Defendant accompanied Wolk to her deposition in July, he was not yet attorney of record. The first hour was spent in argument between the lawyers. As expected, the opposition attorney did not want to allow Defendant in the room. Finally he agreed to allow Defendant to *sit* with the Plaintiff, with the caveat that he could neither advise nor raise objections.

34.      Two days later—on the last day of discovery—Defendant deposed the SLAPP filer. Defendant was not yet attorney of record. The deponent failed to comply with the subpoena duces tecum and replied to questions with memory failure or innocuous responses. Defendant, either oblivious to the date of discovery cut-off or intending to use this to bill the Plaintiff for more useless work, filed a motion to compel.

35.     When Defendant returned from his vacation, he attended court on his motion to compel. It was denied as untimely. He did not inform the Plaintiff of the true reason for the denial. Plaintiff learned the reason from the court's online register of actions.

36.    The failure to schedule the deposition in a timely manner, the failure to acquire the subpoenaed documents, and the failure to observe discovery cutoff crippled the Plaintiff's ability to prepare for trial.

37.    As direct and proximate result of the above-described acts Plaintiff seeks damages in excess of $75,000.

## SECOND CAUSE OF ACTION

### Extortion

38.    Plaintiff incorporates by reference as if fully set forth below each and every allegation in the foregoing paragraphs.

39.    California Penal Code defines extortion as "the obtaining of property from another, with his consent . . . induced by a wrongful use of force or fear, or under color of official right." (Sec. 518) "Fear, such as will constitute extortion, may be induced by a threat, either: (1) To do an unlawful injury to the person or property of the individual threatened . . . (3) To expose, or to impute to him or them any deformity, disgrace or crime." (Penal Code, sec. 519). Section 524 of the Penal Code, as amended in 1929, reads as follows: "*Attempts to extort money or property by means of threats*." Under Penal Code section 523, extortion includes the *intent* to extort, whether or not the effort succeeds. "The intent to extort money or other property from another by sending or delivering to any person any letter or other writing, whether subscribed or not, expressing or implying, or adapted to imply, any threat such as is specified in Section 519, is punishable in the same manner as if such money or property were actually obtained by means of such threat."

40.     Defendant repeatedly extorted money by threatening to abandon her unless Plaintiff met each new demand for money. The threat was outrageous because (a) the trial date loomed ever closer and (b) Defendant refused to return any funds which might have made possible the hiring of another attorney. The threats were oppressive in that Defendant was aware of the emotional and financial distress he caused the Plaintiff.

41.     As direct and proximate result of the above-described acts Plaintiff Wolk seeks damages in excess of $75,000.

### THIRD CAUSE OF ACTION

Misrepresentation

42.      Plaintiff incorporates by reference as if fully set forth below each and every allegation in the foregoing paragraphs.

43.     Defendant induced the Plaintiff to hire him with fraudulent assurances. When he agreed to take the case to trial, Defendant failed to disclose that he had neither the time (due to his planned vacation) nor the experience as a trial attorney.

44.     Defendant similarly misrepresented himself to the Court at the continuance hearing. He did not admit that he was retained on May 2 and sent an engagement letter to Plaintiff on May 4. Instead, he told the Court that he was retained on May 10, so that he could falsely claim the motion for continuance was filed "only 15 days later." He also falsely claimed that he would substitute in if the trial date was postponed, and he used a newly dated substitution and proposed proof of service as exhibits to his declaration.

45.     Although the Court extended the trial date, Defendant did not file the substitute form that day. He chose not to file until July 12, approximately three weeks after the continuance hearing and two and a half months after he cashed the first of Plaintiff's checks.

46.     Defendant falsely claimed that he was lead attorney in two cases that went to trial with verdicts in his clients' favor. Recently the Plaintiff learned that Defendant Green never took a case to trial. Every case, whether in federal or state court, was settled.

47.     As a direct and proximate result of the above-described acts Plaintiff Wolk seeks damages in excess of $75,000.

## FOURTH CAUSE OF ACTION

### Breach of Fiduciary Duty

48.     Plaintiff incorporates by reference as if fully set forth below each and every allegation in the foregoing paragraphs.

49.     "A fiduciary or confidential relationship can arise when confidence is reposed by persons in the integrity of others, and if the latter voluntarily accepts or assumes to accept the confidence, he or she may not act so as to take advantage of the other's interest without that person's knowledge or consent." [ ] "The relation between attorney and client is a fiduciary relation of the very highest character, and binds the attorney to most conscientious fidelity ...." [  ] *Pierce v. Lyman* (1991) 1 Cal.App.4[th] 1093; 3 Cal.Rptr.2d 236.

50.     The Defendant breached his fiduciary duty by charging for services he never intended to provide and, in fact, did not provide.

51.     The Defendant breached his fiduciary duty by demanding increasing sums and failing to take any useful action on her behalf.

52.     As early as May 20, 2005 Defendant billed for more than $20 thousand although he was not yet attorney of record, had not yet filed the motion to continue the trial date, and had not scheduled any depositions nor performed any other discovery.

53.     Defendant's refusal to substitute as attorney of record forced the Plaintiff to continue pro se, which made it impossible for her to devote time and energy to income-producing work.

54.     The Defendant breached his fiduciary duty by reporting Wolk to a collection agency and the credit bureaus, which caused her further injury.

55.     As direct and proximate result of the above-described acts Plaintiff seeks damages in excess of $75,000.

### FIFTH CAUSE OF ACTION
<u>Willful Misconduct</u>

56.      Plaintiff incorporates by reference as if fully set forth below each and Every allegation in the foregoing paragraphs.

57.     Willful misconduct is intentional, wrongful conduct done either with knowledge that serious injury probably will result or with a wanton and reckless disregard of the possible result. (*Reuther v. Viall* (1965) 62 Cal.2d 470, 475 [42 Cal.Rptr. 456, 398 ¶.2d 792] [citation].) Three elements are necessary to raise a negligent act to the level of willful misconduct: actual or constructive knowledge of the peril to be apprehended; actual or constructive knowledge that injury is a probable as opposed to a possible result of the danger; and a conscious failure to act to avert that peril. (*Bains v. Western Pacific R.R. Co.*(1976) 56 Cal.App.3d 902, 905 [128 Cal.Rptr.

778]; *Pacific Bell v. Colich* (1988) 198 Cal.App.3d. 1225, 1242.) Defendant Philip's misconduct was intentional and wrongful.

58.   Defendant knew that his refusal to become attorney of record would cause direct injury to the Plaintiff since she was forced to continue pro se which, in turn, impeded her from performing income-producing work.

59.   Defendant's knew that his acts and omissions would harm the Plaintiff. She repeatedly explained the importance of going to trial, of getting the facts on record, and how the Plaintiff planned to use this to salvage her reputation as a reliable source of information. Plaintiff repeatedly explained this because Defendant repeatedly badgered the Plaintiff to settle, and because he failed to prepare for trial.

60.   Defendant performed these acts with full knowledge that they were injurious to the Plaintiff and would have grave consequences for her. He knew this not only because he was directly informed by the Plaintiff but also by the elder law attorney whose aid she sought.

61.   Defendant's willful misconduct continued to the very end, when he insisted that Plaintiff agree to withhold from public view not only the pages of her Web site that proved she had not defamed the viatical broker but numerous other pages about which he did not notify her prior to the August 19 agreement to settle the underlying case.

62.   Willful misconduct continued after representation terminated when Defendant and his wife, attorney Beverly Green, took turns making phone calls and sending email to demand an additional $5,800.00.

63.   Willful misconduct continued when Defendant assigned the alleged

balance of $5,800 to a collection agency and filed with credit reporting bureaus. Defendants took these additional steps with full awareness that the Plaintiff lacked funds for her own needs.

64.    Throughout the months of their association, Defendant showed a wanton and reckless disregard of the possible result of his behavior toward Wolk. R*euther v. Viall* (1965) 62 Cal.2d 470, 475; 398 P.2d 792, 42 Cal.Rptr. 456 [definition for purpose of guest statute].

65.    As proximate and direct result for the above-described acts Plaintiff seeks damages in excess of $75,000.

## FIFTH CAUSE OF ACTION
### Breach of Contract

66.    Plaintiff incorporates by reference as if fully set forth below each and every allegation in the foregoing paragraphs.

67.    Defendant breached the contract, which was entered into for the sole purpose of taking the case to trial. He further breached the contract by refusing to sign on as attorney of record until four days after the initial trial date; by failing to adequately prepare for depositions; by failing to observe critical deadlines; by failing to prepare for trial; and by coercing the Plaintiff into settling on terms that were less favorable than a settlement she rejected the previous year.

68.    As proximate and direct result for the above-described acts Plaintiff seeks damages in excess of $75,000.

## SIXTH CAUSE OF ACTION
### Negligent Infliction of Emotional Distress

69.    Plaintiff incorporates by reference as if fully set forth below each and

every allegation in the foregoing paragraphs.

70.    Defendant engaged in negligent conduct by failing to provide the services necessary to prepare for trial.

71.    The Defendant's negligent conduct caused Plaintiff to suffer serious emotional distress and financial loss. Defendant was aware of these consequences.

72.    As proximate and direct result for the above-described acts Plaintiff seeks damages in excess of $75,000.

## SEVENTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

73.    Plaintiff incorporates by reference as if fully set forth below each and every allegation in the foregoing paragraphs.

74.    On several occasions the Plaintiff had to terminate telephone conversations, due to Defendant's utter disregard for the probability that his conduct caused Plaintiff emotional distress.

75.    Defendant persisted in conduct that he knew inflicted emotional distress, even after the Plaintiff contacted an elder abuse attorney for counsel about these issues.

76.    As proximate and direct result for the above-described acts Plaintiff seeks damages in excess of $75,000.

## EIGHTH CAUSE OF ACTION

### Elder Fraud Abuse

77.    Plaintiff incorporates by reference as if fully set forth below each and every allegation in the foregoing paragraphs.

78.     Welfare and Institutions Code § 15610.27 describes "elder" as "any person residing in this state, 65 years of age or older. Defendant knew that the Plaintiff was more than sixty-five years of age at the time he agreed to take the case to trial. He was told this because Plaintiff's objective in going to trial was directly related to her need to earn income and contribute to retirement savings.

79.     Welfare and Institutions Code § 15610 et seq. applies because the acts of Defendant were deceptive and directed toward financial abuse of an elder, and Defendant chose not only to retain property belonging to the Plaintiff but to cause further injury through harassment and reports to credit bureaus and a collection agency.

80.     Had the Plaintiff been informed at the start that Defendant's vacation conflicted with her trial date, she would have used the services of another attorney. Had the Plaintiff known that the Defendant had no trial experience, she would have hired another attorney. Had she known that she would have to continue pro se, she would have hired another attorney or elected to settle the case on her own.

81.     Defendant knew that his conduct was directed to a senior citizen. He asked if she lived in the retirement community in Laguna Hills, where his parents reside.

82.     Under Welfare and Institutions Code § 15657.5(a) when a defendant is liable for financial abuse as defined in § 15610.30, "in addition to all other remedies otherwise provided by law, the court shall award to the plaintiff reasonable attorney's fees and costs."

83.     Under Civil Code § 3345 the Plaintiff is entitled to trebling of any penalties or remedies.

/ / /

### NINTH CAUSE OF ACTION

<u>Unjust Enrichment</u>

84.   Plaintiff incorporates by reference as if fully set forth below each and every allegation in the foregoing paragraphs.

85.   Defendant was unjustly enriched by the sums paid by Plaintiff, which conferred upon him and his law firm benefits that were not earned and caused Plaintiff to suffer corresponding injuries. It is inequitable for Defendant to retain these monies. *First Nationwide Savings v. Perry* (1992) 11 Cal.App.4th 1657, 1662-1663; *California Medical Assn. v. Aetna U.S. Healthcare of California, Inc.* (2001) 94 Cal.App.4th 151, 172; Rest., Restitution, § 1, com. c.)

86.   As direct and proximate result of the above-described acts Wolk seeks damages in excess of $75,000.

### DEMAND FOR JURY TRIAL

Plaintiff demands jury trial on all issues.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.   An injunction to prevent the Defendant from continuing to use these tactics with other clients and, in particular, with clients who are over the age of sixty-five;

B.   An injunction to order the Defendant to withdraw his complaint with the collection agency and with credit reporting agencies;

C.   Damages in an amount greater than $75,000, and in any event an amount which is sufficient to fairly and adequately compensate Wolk for all direct

and proximate losses resulting from the Defendant's acts and omissions, and for such other and further relief as justice may require.

D.      For attorney fees and costs for bringing this action;

E.      For consequential damages resulting from forfeiture of economic opportunities;

F.      For consequential damages resulting from injury to her credit rating;

G.      For consequential damages resulting from losses due to the need to refinance her home at a high rate of interest in order to acquire sufficient funds to relocate out of state, and the expense of relocation;

H.      For punitive damages;

I.      For such other and further relief as is just and proper for a senior citizen who was the victim of an attorney and his law firm.

Signed under penalty of perjury under the laws of the state of North Carolina.

Date: June 18, 2007

                                                    _**/s/**_     Gloria Grening Wolk

                                                                  Plaintiff Pro Se

CERTIFICATE OF SERVICE

I, Gloria Grening Wolk, declare:

I am a citizen of the United States, am over the age of eighteen years, and am a

party to the within entitled cause.

On June 17, 2007 I served the following document(s) on the parties in the within

action:

**SECOND AMENDED COMPLAINT**

| | |
|---|---|
| **X** | **BY MAIL**: I am familiar with the business practices for collection and processing of mail. The above-described document(s) will be enclosed in a sealed envelope, with PRIORITY MAIL postage thereon fully prepaid, an deposited with the United States Postal Service at Raleigh, North Carolina on this date, addressed as follows: |
| | **BY HAND**: The above-described document(s) will be placed in a sealed envelope which will be hand-delivered on this same date by _____ addressed as follows: |
| X | **VIA ELECTRONIC DELIVERY**: The above-described document(s) will be delivered through email and a copy of same will be mailed on this same date to the following: |
| | **VIA FACSIMILE**: The above-described document(s) will be transmitted via facsimile, and a copy of same will be mailed, on this same date to the following: |
| | **VIA OVERNIGHT SERVICE:** The above-described document(s) will be delivered by overnight service to the following: |

Timothy J. Halloran                                      Attorneys for Philip R. Green
Summer M. Smith
MURPHY, PEARSON, BRADLEY & FEENEY
88 Kearny Street, 10th Flr.
San Francisco, CA 94108-5530

I declare under penalty of perjury under the laws of the State of North Carolina that

the foregoing is a true and correct statement and that this Certificate was executed on May

20, 2007.

By /S/ Gloria Grening Wolk

Plaintiff Pro Se